## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### Houston Division

———————————————————

UNITED STATES OF AMERICA *ex rel.*
CECILIA GUARDIOLA and

STATE OF TEXAS *ex rel.*
CECILIA GUARDIOLA,

    *Plaintiffs,*

    *v.*

CHRISTUS HEALTH,

CHRISTUS SPOHN HEALTH SYSTEM
CORPORATION,

CHRISTUS SPOHN HOSPITAL
CORPUS CHRISTI – SHORELINE,

CHRISTUS SPOHN HOSPITAL
CORPUS CHRISTI – MEMORIAL,

CHRISTUS SPOHN HOSPITAL
CORPUS CHRISTI – SOUTH,

CHRISTUS SPOHN HOSPITAL ALICE,

CHRISTUS SPOHN HOSPITAL BEEVILLE,

and

CHRISTUS SPOHN HOSPITAL KLEBERG,

    *Defendants.*

———————————————————

Civil Action No. 08 – 667

JURY TRIAL DEMANDED

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)**

### COMPLAINT

On behalf of the United States of America, plaintiff and relator Cecilia Guardiola files

this *qui tam* complaint against defendants CHRISTUS Spohn Health System Corporation

("CHRISTUS Spohn"), CHRISTUS Spohn Hospital Corpus Christi – Shoreline ("CHRISTUS

Shoreline"),CHRISTUS Spohn Hospital Corpus Christi – Memorial ("CHRISTUS

Memorial"), CHRISTUS Spohn Hospital Corpus Christi – South ("CHRISTUS South),

CHRISTUS Spohn Hospital Alice ("CHRISTUS Alice"), CHRISTUS Spohn Hospital Beeville

("CHRISTUS Beeville"), CHRISTUS Spohn Hospital Kleberg ("CHRISTUS Kleberg")

(collectively, the "CHRISTUS Health defendants") to recover damages resulting from

defendants' knowingly efforts to defraud government-funded health insurance programs

by improperly billing outpatient procedures as inpatient claims.  Ms. Guardiola alleges:

### INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the

United States of America and State of Texas arising from false or fraudulent claims and

statements made or caused to be made by defendants to the United States in violation of

the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") and/or State of Texas in violation

of the Texas Medicaid Fraud Prevention Act ("MFPA"), Tex. Hum. Res. Code Ann.

§ 36.001, *et seq.*  The false or fraudulent claims, statements and records at issue involve

payments made by government-funded health insurance programs, such as Medicare and

Medicaid, for services provided by the CHRISTUS Health defendants.

2.     Originally enacted in 1863, the FCA was amended substantially in 1986 by

the False Claims Amendments Act.  The 1986 amendments enhanced the Government's

ability to recover losses sustained as a result of fraud against the United States.

3.     The FCA provides that any person who knowingly submits or causes to

submit to the Government a false or fraudulent claim for payment or approval is liable for

a civil penalty of between $5,500 and $11,000 for each such claim, plus three times the

amount of damages sustained by the Government.  The Act empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in the recovery.  The complaint must be filed under seal without service on any defendant.  The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to join the action.

4.      Originally enacted in 1995 and amended in 2007, the MFPA, is modeled after the FCA and seeks to prevent similar harm to the Medicaid Program administered by the State of Texas.

5.      Pursuant to the FCA and MFPA, relator seeks to recover on behalf of the United States and State of Texas damages and civil penalties arising from false and fraudulent claims, supported by false statements, that defendants submitted or caused to be submitted to government-funded health insurance programs.

### PARTIES

6.      Cecilia Guardiola is a registered nurse, compliance professional and law school graduate with extensive nursing and compliance experience.  After graduating from Michigan State University's Detroit College of Law in 2002, Guardiola returned to the field of health care in positions that were increasingly administrative and compliance-oriented.  After working as a Clinic Nurse at M.D. Anderson in Houston, she accepted, in September 2003, a position as Director of Case Management at El Paso's Providence Memorial Hospital, dealing with utilization review and regulatory compliance issues.  In December 2005, Ms. Guardiola was recruited to join defendant CHRISTUS Shoreline as its Director of Case Management.  At CHRISTUS Shoreline, Ms. Guardiola managed a 22-person

department, serving as the regulatory compliance liaison for all third-party payers, providing utilization review functions and interacting with corporate and hospital administrators and physicians on compliance issues.

7.      Ms. Guardiola resigned her position at CHRISTUS Shoreline in April 2007 after hospital officials and physicians repeatedly refused to follow her advice, preferring to continue defrauding government-funded health insurance programs.  At that time, Ms. Guardiola took a job as Director of Concurrent Review for AETNA in connection with its administration of the Mercy Care Plan in Phoenix, Arizona, overseeing a staff of 55 people in addressing medical necessity determinations and regulatory compliance issues relating to Medicare and Medicaid.  Since December 2007, Ms. Guardiola has been working as a healthcare consultant, providing a wide range of services to hospitals and other healthcare providers, including coding and documentation assistance, clinical review of medical records and educational efforts.  Ms. Guardiola brings this action for violations of the FCA on behalf of herself and the United States pursuant to 31 U.S.C. § 3730(b)(1) and on behalf of the State of Texas pursuant to the MFPA, Tex. Hum. Res. Code Ann. § 36.001, *et seq.*

8.      The CHRISTUS Health defendants are related-entities providing hospital services under the umbrella of CHRISTUS Health, a Texas nonprofit corporation and one of the largest Catholic health systems in the United States.  CHRISTUS Health provides health care services through 50 hospitals and numerous other health care facilities in six states and Mexico.

9.      CHRISTUS Spohn Health System Corporation is a Texas nonprofit corporation and, upon information and belief, is a wholly-owned subsidiary of CHRISTUS Health.  CHRISTUS Spohn operates six hospitals along the Texas Gulf Coast, including

— 4 —

defendants CHRISTUS Alice, CHRISTUS Beeville, CHRISTUS Kleberg, CHRISTUS Memorial, CHRISTUS Shoreline and CHRISTUS South.  These six hospitals form an administrative region and much of each hospital's regulatory and administrative guidance is provided by regional and corporate personnel.

10.     Other component institutions within the CHRISTUS Health system include CHRISTUS Health Central Louisiana, CHRISTUS Health Northern Louisiana, CHRISTUS Health Southwestern Louisiana, Baptist St. Anthony's Health System, CHRISTUS Health Ark-La-Tex, CHRISTUS Health Gulf Coast, CHRISTUS Health Southeast Texas, CHRISTUS Santa Rosa Health Care and CHRISTUS Health Utah.

11.     None of the CHRISTUS Spohn entities has their own compliance department. Compliance is directed solely by CHRISTUS Health's corporate offices through regional offices that oversee local operations.  As a result, Ms. Guardiola had extensive conversations with the most senior managers at CHRISTUS Health about the issues she uncovered.  Because CHRISTUS Health corporate officials were involved in discussions concerning the wrongdoing and failed to correct it, and because Ms. Guardiola has evidence that the FCA violations she observed at CHRISTUS Shoreline were taking place at other CHRISTUS entities, Ms. Guardiola alleges that all hospitals within the CHRISTUS Health system are engaging in fraudulent conduct.

## SUMMARY OF ALLEGATIONS

12.     Ms. Guardiola alleges that defendants defrauded government-funded health insurance programs by knowingly billing services that should have been performed on an outpatient basis as if they were expensive inpatient services.  Defendants did this in two ways.

— 5 —

13.     Defendants billed outpatient surgical procedures using inpatient DRG codes. By routinely billing outpatient surgical, medical and rehabilitative procedures as if they required inpatient status, Defendants greatly increased the amounts paid by government-funded health insurance programs.

14.     Defendants billed short-term, outpatient hospital visits — those that should last less than 24 hours and should be coded as "patient observation" — as if they required an overnight stay, fraudulently qualifying the service for reimbursement as a much more expensive inpatient service.

15.     Defendants' management at individual hospitals, as well as the regional and corporate level, are aware of these fraudulent billing practices and encouraged and facilitated the continuing fraud against government-funded health insurance programs.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730. This Court has supplemental jurisdiction over the counts relating to the MFPA pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

17.     The Court has personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and defendants have sufficient minimum contacts with the United States.

18.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the defendants can be found, reside or have transacted business in the Southern District of Texas.

— 6 —

19.    This suit is not based upon the prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation or in a Government Accountability Office or Auditor General's report, hearing, audit, investigation, or from the news media.

20.    To the extent that there has been a public disclosure unknown to the relator, the relator is the original source under 31 U.S.C. § 3730(e)(4). Relator has direct and independent knowledge of the information on which the allegations are based and voluntarily provided the information to the Government before filing this *qui tam* action based on that information. *See* 31 U.S.C. § 3730(e)(4).

## BACKGROUND ALLEGATIONS

### Government-funded Health Insurance Programs and Physician Services

21.    Defendants' wrongdoing was committed against government-funded health insurance programs, including, without limitation, Medicare and Medicaid.

22.    Medicare is a federally-funded health insurance program primarily benefiting the elderly. It was created in 1965 when Title XVIII of the Social Security Act was adopted. Medicare is administered by and through Centers for Medicare & Medicaid Services ("CMS").

23.    Medicaid is a public assistance program providing for the payment of medical expenses for low income patients. It was created in 1965 when Title XIX was added to the Social Security Act. *See* 42 U.S.C. §§ 1391-1396. The Federal Government identifies basic services that each state participating in Medicaid must offer its indigent population and establishes certain optional services that states may choose to provide and for which they can receive federal matching funding. The Federal Government funds approximately

60% of the Texas Medicaid Program, *see* 42 U.S.C. § 1396, but Texas is responsible for administering the program.

## LEGAL AND REGULATORY BACKGROUND

### Inpatient and Outpatient Status Defined

24.    Medicare defines an inpatient as a "person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services." *Medicare Benefit Policy Manual,* Ch.1, § 10 (Pub. 100-02).  The patient's physician is "responsible for deciding whether the patient should be admitted as an inpatient." *Id.*  Physicians may order inpatient "admission for patients who are expected to need hospital care for 24 hours or more, and treat others on an outpatient basis." *Id.*

25.    CMS recognizes that "the decision to admit is a complex medical judgment" requiring a physician to consider various factors such as "[t]he severity of the signs and symptoms exhibited by the patient" and "[t]he medical predictability of something adverse happening to the patient." *Id.*  Significantly, CMS notes that "[a]dmissions of particular patients are not covered or noncovered solely on the basis of the length of time the patient actually spends in the hospital." *Id.*  In particular, "when patients with known diagnoses enter a hospital for a specific minor surgical procedure or other treatment" that is expected to keep a patient in the hospital for less than 24 hours, the patient must be considered an outpatient for Medicare coverage purposes." *Id.*

26.    Bridging the gap between inpatient and outpatient admission status is "outpatient observation" status. "Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and

reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital." *Id.*

27.     Outpatient observation is a specific hospital admission status that may be appropriate under a variety of circumstances.  It is "commonly assigned to patients . . . who require a significant period of treatment or monitoring before a decision is made concerning their admission or discharge." *Medicare Benefit Policy Manual*, Ch. 6, § 20.5.A. (Pub. 100-02) (Exhibit 5); *see Medicare Claims Processing Manual*, Ch. 4, § 290.1 (Rev. 1, 10-03-03) (Exhibit 7).  Outpatient observation also is appropriate when the physician requires additional time to evaluate the patient before deciding whether the patient needs inpatient admission or the physician anticipates that the patient's condition can be evaluated or treated within 24 hours or rapid improvement in the patient's condition is anticipated within 24 hours.  Observation status is commonly assigned to patients who present to the emergency department and require a period of treatment or monitoring before a decision is made concerning their admission or discharge. *Medicare Benefit Policy Manual,* Pub. 100-02, Ch. 6, Sec. 20.5.A  Observation status is also often appropriate for outpatient surgical patients whose condition requires extra recovery or follow up care. *Id.*

28.     CMS directs that services "provided for the convenience of the patient, the patient's family, or a physician" including — services "following an uncomplicated treatment or a procedure" — are not covered as outpatient observation services.  In addition, "[s]tanding orders for observation following outpatient surgery" are not covered. *Medicare Benefit Policy Manual* at § 20.5.D.

**Coding of Medicare Claims**

29.    Outpatient procedures are classified and reported using Medicare's HFCA Common Procedure Coding System ("HCPCS").   This system is intended to simplify reporting of services rendered and to identify the services or supplies provided.   The HCPCS Coding system consists of three coding levels.  Level I codes are found in Current Procedural Terminology ("CPT"), published by the American Medical Association.  The CPT uses five-digit codes with descriptive terms to identify services performed by health care providers and is the country's most widely-accepted coding reference.   Level II national codes (also referred to as "HCPCS") have been developed by HFCA to report medical services and supplies not found in the CPT.  Level III local codes are assigned and maintained by individual Medicare carriers to describe new procedures that are not yet included in Level I or Level II codes.   Documentation supporting the medical necessity for treatment, such as a diagnosis code, must be submitted with each claim for payment. Diagnoses are classified and reported using International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9-CM") system, established by CMS and the National Center for Health Statistics.

30.    Inpatient procedures are billed using a different system.  The coding of inpatient charges vary depending on the payer, type of service and setting in which the services are delivered.   For hospitals, there are several types of charges that are incorporated into the hospital bill, including facility and ancillary charges.  Hospital facility charges consist of room, board and nursing care.   Ancillary charges include radiology, laboratory, pharmacy and miscellaneous supplies.  The facility and ancillary charges are coded using the ICD-9-CM system for inpatient hospital care for diagnoses and procedures.

— 10 —

31.     Inpatient hospital stays are also coded using a three-digit diagnosis-related group (DRG).  The DRG system was developed for Medicare as part of the inpatient prospective payment system.  It is used to classify hospital cases into one of approximately 500 groups based on the expectation that the cases use similar hospital resources.  The DRG charge is dependent upon the level of care that the patient requires, with higher intensity of care being reflected with a higher charge.  The patient's level of care is, in part, determined by the procedures performed while in the hospital.  Such procedures are coded using a 4-digit numeric ICD-9-CM code in the form xx.xx.  The DRG payment is intended to be  a single, all-encompassing payment covering all facility and ancillary charges, regardless of how long the patient is admitted or the number of services provided..

32.     At the time of Ms. Guardiola's hiring, CHRISTUS Shoreline did not have a Utilization Review Committee, a violation of Medicare's conditions of participation.  It also did not use any objective, third-party tools to conduct utilization review and verify medical necessity determinations.   Although Ms. Guardiola was denied funding for software products to assist in the proper coding of claims, she did obtain several printed "Interqual Criteria" manuals that she used to train and educate her staff.

33.     Interqual Criteria is an industry-standard suite of products designed by McKesson Corporation to assist healthcare organizations in facilitating quality of care and clinical resource utilization by providing objective criteria based on well-researched scientific knowledge and real world clinical experience to assess the medical necessity of care for individual patients.  The system allows healthcare organizations to achieve a clinically validated approach to decision-making on patient care and billing issues.

— 11 —

34.    CHRISTUS Health recognizes that when a patient does not meet inpatient level of care criteria but is admitted for a one-day stay, payment may not be sought under the DRG system (Medicare Part A) and must be made under Part B.  CHRISTUS Health also recognizes that if a patient's treatment is erroneously billed as an inpatient service, a corrected claim form should be submitted to correct the billing.

**Services Must be "Medically Necessary" and Fully Documented**

35.    Medicare and Medicaid require, as a condition of coverage, that services be reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1)(A).  Providers must provide economical medical services and, then, provide such services only where medically necessary.  42 U.S.C. § 1320c-(a)(1).  Providers must provide evidence that the service is medically necessary and appropriate, 42 U.S.C. § 1320c-5(a)(3), and must ensure that services provided are not substantially in excess of patient needs, 42 U.S.C. § 1320a-7(b)(6)&(8).

36.    Federal law specifically prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a Federal health care program." *See* 42 U.S.C. § 1320-a-7b(a)(1).  Similarly, Federal law requires providers who discover material omissions or errors in claims submitted to the Medicare to disclose those omissions or errors to the Government. See 42 U.S.C. § 1320-a-7b(a)(3). The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program. *See*, e.g., 42 C.F.R. §§ 1003.105, 1003.102(a)(1)-(2).

## SPECIFIC ALLEGATIONS

### Defendants Have Extensive Knowledge of the Issues Raised by Ms. Guardiola

37.     Prior to Ms. Guardiola's arrival at CHRISTUS Shoreline, CHRISTUS Health's corporate compliance group had initiated a system-wide evaluation of its hospitals' improper billing practices for outpatient observation.  In April 2006, CHRISTUS Health issued a Corporate Compliance Bulletin that addressed the issue.

38.     Ms. Guardiola began her work unaware of the prior corporate directive related to outpatient observation.  She became aware of compliance issues relating to outpatient observation when CHRISTUS Health Compliance Auditor, William Palmos , conducted a spot audit that revealed 100% noncompliance at CHRISTUS Shoreline.

39.     Then-CHRISTUS Spohn CEO Kathryn McDonagh was extremely unhappy that Mr. Palmos had uncovered continuing problems.  She directed Ms. Guardiola to devise a system to ensure 100% compliance with outpatient observation billing requirements.

### Ms. Guardiola Initiated Case Management Review to Prevent Billing Fraud

40.     Ms. Guardiola immediately designed a process to identify outpatient observation issues and ensure their proper coding prospectively, before they were billed. Central to the new process was the creation of a "0-2 day" report to capture all patient claims with a length of stay ("LOS") between zero and two days.  The report was generated, worked and cleared daily by registered nurse case managers under Ms. Guardiola.  The case managers reviewed the patient record for an appropriate physician order, evaluated medical necessity based on Interqual criteria and released the account to Billing and Accounts Receivable ("B/AR") for claim processing.  The Interqual criteria were used to objectively measure the severity of the illness (SI) and the intensity of the

service (IS) provided to arrive at a determination of the appropriate service level.  After Case Management's initial Interqual review, a second level review was performed by an observation multidisciplinary team each week.

41.    While focusing on preventing errors in coding for outpatient observation, the Case Management staff soon discovered a bigger problem involving the billing of outpatient procedures on an inpatient basis.  In particular, many of the procedures being billed as inpatient procedures were not listed on Medicare's "Inpatient List," a designation of those procedures that may be billed exclusively on an inpatient basis.  Ms. Guardiola and her staff identified many "Medicare One Days," single day inpatient admissions for procedures not on the Inpatient List and for which no other criteria justified inpatient admission.

42.    The "0-2 day" and the subsequent "Medicare 1-day" review processes generated significant resistance and complaints from the medical staff, who were unhappy with Case Management's determinations that orders were missing, clinical criteria were not being met and medical necessity determinations did not support inpatient admissions.

43.    In    particular,    many    interventional    cardiologists    challenged    Case Management's determinations because they were being told that procedures treated as inpatient in the past were now to be performed on an outpatient basis.  Ms. Guardiola arranged for an outside consultant, Dr. Neil Greishop, to perform in-service training with the medical staff, primarily the cardiologists, on the differences between outpatient observation and inpatient status.

**Financial Ramifications and the Fox Hollow Procedure**

44.    Whether a surgical procedure qualifies for inpatient status is of tremendous financial significance.  Although Ms. Guardiola alleges that defendants' fraudulent billings

— 14 —

encompassed virtually all surgical procedures, the impact of the wrongdoing is most easily illustrated in the case of cardiac care.

45.     Ms. Guardiola's team discovered that cardiologists were routinely billing elective arthrectomies (procedures whereby blockages are removed from cardiac arteries) as inpatient surgeries, even though the procedure was not on the Inpatient List and patients did not meet other criteria for inpatient admission. At CHRISTUS Shoreline, the procedure was referred to as a "Fox Hollow," named after the vendor that manufactures the device used to perform the procedure.

46.     When performed on an inpatient basis, the Fox Hollow procedure is billed using DRG 110, 111, 479, 553, 554 or 555. During the first quarter of 2007, depending on which DRG is used and the complexity of the procedure, the hospital was paid between $7,500 and $22,000 when the Fox Hollow procedure was billed using these DRGs. However, when the same procedure is performed on an outpatient basis, no DRG is billed and the reimbursement to the hospital is approximately $3,500 based on facility and ancillary charges associated with the outpatient procedure. Reimbursement for DRG 554, which is most commonly associated with 1-day Fox Hollow billing, averages $10,300, a difference of $6,800 for each fraudulently billed procedure.

47.     During a sixteen-month period spanning FY 2006 and the first four months of FY 2007, approximately 150 Fox Hollow procedures were performed just at CHRISTUS Shoreline with approximately 80% of the procedures done on a 1-day inpatient admission basis.

48.     Although among the highest dollar items at issue, the Fox Hollow procedures represent only a fraction of all cases being billed by defendants as inpatient admissions

without medical necessity.  Many other medical and surgical cases — involving such things as pacemakers, cardiac stents, cardiac defibrillators, chest pain congestive heart failure, pneumonia — were also being billed improperly under inpatient DRGs.

**Despite Ms. Guardiola's Efforts Defendants Continued to Bill Improperly**

49.     Once Ms. Guardiola's Case Management group determined that a particular claim lacked sufficient medical necessity to be billed on an inpatient basis, they documented their findings in the B/AR computer system so that the claim could be properly billed.  The information documented in B/AR was intended to make the business office aware that the claim lacked the medical necessity to qualify for billing on an inpatient basis and should be submitted for ancillary outpatient items only.

50.     Ms. Guardiola discovered, however, that the billing office was ignoring Case Management's B/AR documentation. Ms. Guardiola's investigation revealed that the billing office was continuing to bill outpatient procedures as inpatient claims at excessive rates.

**CHRISTUS Health's Corporate Knowledge of Billing Problems**

51.     Alarmed by her findings, Ms. Guardiola, in early December 2006, reported the billing problems to a variety of people, including CHRISTUS Shoreline COO Paul Trevino, CHRISTUS Spohn Regional CFO Sandra Williams, CHRISTUS Spohn Regional Director of Medical Reimbursement Chris Janik, CHRISTUS Spohn Regional Vice President for Quality Pam Hockett, CHRISTUS Spohn Regional Vice President of Medical Affairs Dr. Richard Davis and CHRISTUS Spohn Regional Integrity Officer David Frum.

52.     At a meeting attended by Ms. Guardiola and all these individuals (except Mr. Janik), CFO Williams was charged with hiring an outside consultant to review the Case Management process and identify incorrectly billed claims.

— 16 —

53.    Consultant Sue Burgess was retained in late December 2006. A meeting was held among key players including Ms. Guardiola, Mr. Janik, Ms. Williams, Nurse Auditor Elizabeth Brunner and Margaret Dipple, Manager of Medicare Billing. Ms. Dipple confirmed that the billing department was not considering the Case Management medical necessity findings prior to billing Medicare claims.

54.    Ms. Dipple suggested that Case Management should fax hard copies of their Interqual reviews to the billing department.  Ms. Guardiola agreed to do this and directed her case managers to document medical necessity deficiencies in the B/AR software and fax their reviews to a dedicated line in Ms. Dipple's billing department.

55.    Ms. Guardiola followed up on the claims that were faxed to Ms. Dipple and found that the Case Management determinations still were being ignored.  Outpatient claims continued to be billed improperly as inpatient admissions.

**The Burgess Report Confirms the CHRISTUS Health Defendants' Fraud**

56.    In January 2007, Ms. Burgess delivered her consultant's report, which confirmed Ms. Guardiola's allegations.  In particular, the report found:

> There is no pre-admission review performed prior to the procedure to determine if the patient actually meets clinical criteria for inpatient admission.  Since these procedures tend to be one-day stays, the patient is typically discharged before case management is able to review the medical record for the appropriateness of clinical criteria.   When post-discharge review is performed, it is usually determined the physician documentation of clinical criteria only supports and outpatient level of care. . . .  Consequently, many of these cases are inappropriately billed for a DRG level of reimbursement . . . .

Ms. Burgess also found that CHRISTUS Shoreline was violating Medicare conditions of participation by failing to maintain a Utilization Review Committee and that such failure

— 17 —

contributed to the improper billings.  Ms. Burgess noted that claims involving Fox Hollow procedures "were billed as inpatient admissions, did not meet clinical criteria for inpatient level of care, and were paid under the DRG reimbursement methodology." However, Ms. Burgess concluded that "[i]t is not necessary to refund Medicare for DRG reimbursement received for the list of Medicare payments, or to self-disclose."

57.     By the end of February, Ms. Guardiola realized that defendants' leadership would not implement corrections to address the billing fraud. Recognizing that her effectiveness was undermined and discouraged by the ongoing fraud, Ms. Guardiola resigned her position in March 2007.

**Identical Problems at Other CHRISTUS Health Facilities**

58.     During the time that Ms. Guardiola was attempting to convince defendants' management to deal in an appropriate manner with the improper billing issues, she became aware that the problems at CHRISTUS Shoreline were evident at other CHRISTUS Spohn facilities.

59.     In particular, Ms. Guardiola participated in monthly Quality/Case Management meetings with her counterparts from the other CHRISTUS Spohn facilities.  Participants in the monthly meetings included Richard Davis (CHRISTUS Spohn, Vice President for Medical Affairs), Pam Hockett (CHRISTUS Spohn, Vice President for Quality), Cindy Hite (CHRISTUS Spohn, Director Accreditation Services), Nina Boies (CHRISTUS Memorial, Director of Case Management), Cec Brown (CHRISTUS South, Director Quality/Case Management), Becky Heinson (CHRISTUS Spohn, Director Quality), Sydney Nau (CHRISTUS Shoreline, Risk Manager) and Randy Prentice (CHRISTUS Alice, Director Quality/Case Management).

60.   At the meetings, Ms. Guardiola raised the issues that form the foundation for this action.  She also discussed these issues with individual case management and quality personnel at other CHRISTUS Spohn facilities.  It was clear to Ms. Guardiola that none of the representatives from other CHRISTUS Spohn facilities had focused on these problems or devised solutions to ensure that outpatient procedures were not billed improperly.  In addition, Ms. Guardiola developed substantial evidence that the wrongdoing was occurring at CHRISTUS Alice.

61.   Dr. Srikanth Demaraju, chairman of the cardiology department at CHRISTUS Shoreline and a primary advocate of the Fox Hollow procedure, complained to RN Case Manager Shannon Finewood, after she reminded him that the Fox Hollow procedures, if elective, need to be performed as outpatient procedures. Dr. Damaraju told Ms. Finewood that he believed all Fox Hollow patients should be billed on an inpatient basis because that was being done at CHRISTUS Alice.

62.   Recognizing the need for standardization across the CHRISTUS Health system, Ms. Guardiola sought to confirm Dr. Damaraju's allegation.  She obtained a Medicare spreadsheet from CHRISTUS Alice showing the DRG billed for Fox Hollow procedures and the status under which were performed.

63.   Ms. Guardiola found that CHRISTUS Alice cardiologist Suraj Kamat was performing the procedures almost exclusively on an inpatient basis, just as Dr. Demaraju suggested.  All the Kamat cases that Ms. Guardiola reviewed neither met inpatient Interqual criteria nor suggested a need for emergent or urgent treatment.  In fact, because the diagnostic arteriograms used to justify the need for the procedures had been performed weeks before the patient's hospital admission, Ms. Guardiola concluded that the

procedures were elective, further preventing them from meeting inpatient Interqual criteria. Elective procedures (unless on the inpatient-only list) are deemed by Medicare to be done on an outpatient basis.

64. In early November 2006, Ms. Guardiola discussed the variation in the way Alice and Shoreline were billing the Fox Hollow procedures with CHRISTUS Shoreline's COO Paul Trevino, Executive Director for Cardiology Services Karen Long, CFO Sandra Williams and Vice President for Quality Pam Hockett. The consensus was that a conference call should be scheduled with CHRISTUS Alice management to discuss the issue.

65. In January or February 2007, Mr. Trevino, Ms. Long and Ms. Guardiola participated in a conference call with CHRISTUS Alice management, including COO Steven Daniels, Vice President of Medical Affairs Dr. Richard Davis, and Director of Quality and Case Management Randy Prentice. Although Mr. Daniels was adamant that the Fox Hollow patients continue to be treated on an inpatient basis, the parties agreed to seek guidance from CHRISTUS Health corporate.

66. That guidance was provided in April 2007 by CHRISTUS Health's corporate Director of Quality and Case Management Reggie Allen. Ms. Guardiola received the guidance verbally in a meeting with Mr. Allen and Ms. Long. Ms. Guardiola explained to Mr. Allen that the Fox Hollow procedures were no longer on the Medicare inpatient list, did not meet medical necessity criteria and were usually not accompanied by documentation sufficient to support inpatient status, but her comments fell on deaf ears. Despite this information, Mr. Allen decreed that all Fox Hollow procedures should be done on an inpatient basis.

— 20 —

67.     Cardiology and other procedures were being routinely and knowingly misbilled by CHRISTUS Shoreline and CHRISTUS Alice. Because this information was well-known to senior CHRISTUS Health management and defendants' senior managers facilitated and encouraged the fraudulent billing, Ms. Guardiola alleges upon information and belief that the billing fraud was being committed at all facilities owned by defendants.

**COUNT ONE**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)**

68.     Relator re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 67 of this complaint.

69.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

70.     By virtue of the acts described above, Defendants knowingly engaged in schemes for the purpose of inducing, and did induce, the presentation of false or fraudulent claims to the United States Government for payment.

71.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States Government false or fraudulent claims.

72.     By virtue of the acts described above, Defendants knowingly concealed the existence of their improper conduct from the United State Government in order to induce payment of false or fraudulent claims.

73.     The United States, unaware of the Defendants' wrongdoing or the falsity of the records, statements or claims made by the Defendants or the Defendants' wrongdoing, paid claims that would not otherwise have been allowed.

74.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT TWO
### False Claims Act
### 31 U.S.C. § 3729(a)(2)

75.     Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 67 of this complaint.

76.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

77.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records or statements to get a false or fraudulent claim paid by the United States Government.

78.     By virtue of the acts described above, Defendants knowingly concealed the existence of their improper conduct from the United States Government in order to induce payment of their false or fraudulent claims.

79.     The United States, unaware of the Defendants' wrongdoing or the falsity of the records, statements, or claims made by the Defendants or Defendants' wrongdoing, paid claims that would not otherwise have been allowed.

80.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT THREE
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. § 36.002(1)

81.     Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 67 of this complaint.

82.     This is a claim for treble damage and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001, *et seq.*

83.     By virtue of the acts described above, Defendants knowingly made or caused to be made to the Texas Medicaid Program a false statement or misrepresentation of a material fact to permit them to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized.

84.     The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

85.     By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT FOUR
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. § 36.002(2)

86.     Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 67 of this complaint.

87.     This is a claim for treble damage and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001, *et seq.*

88.     By virtue of the acts described above Defendants knowingly concealed or failed to disclose information that permitted them to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized.

— 23 —

89.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

90.    By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

WHEREFORE, relator requests that judgment be entered in favor of the United States, State of Texas and Relator against Defendants, ordering that:

a.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.* and Tex. Hum. Res. Code § 36.001, *et seq.*;

b.    Defendants pay an amount equal to three times the amount of damages that the United States and the State of Texas have sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 and a civil penalty of not less than $5,000 and not more than $10,000 for each violation of Tex. Hum. Res. Code § 36.002;

c.    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and Tex. Hum. Res. Code § 36.110(a);

d.    Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d) and 3730(h) and Tex. Hum. Res. Code §§ 36.110(c) and 36.115(a)(2); and

f.    the United States, State of Texas and Relator recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, relator hereby demands a trial by jury.

Respectfully submitted,

Mitchell R. Kreindler
Texas Bar No. 24033518
S.D. Tex. Bar No. 32980
KREINDLER & ASSOCIATES
9219 Katy Freeway, Suite 206
Houston, Texas 77024-1415
T 713.647.8888
F 713.647.8889
mkreindler@blowthewhistle.com

ATTORNEY IN CHARGE FOR
*QUI TAM* RELATOR CECILIA GUARDIOLA